Good afternoon, everybody. Welcome to the 4th Circuit. We have three cases on the calendar this afternoon, and I also want to welcome my good friend and colleague, Judge Bill Traxler, who is appearing remotely with us this afternoon. Good to see you, Judge. All right, the first case is United States v. Duroseau, and Mr. Gray, whenever you are ready, sir. Thank you, Your Honor. It may please the Court. Your Honor, this case is fairly simple. This is about the plain language of a statute 922A5, and the plain language of the statute requires that the government ultimately prove beyond a reasonable doubt that Mr. Duroseau had transferred to another person or entity a firearm. In the language of the statutes, it's quite clear. When we take a look at what the statute requires, it requires ultimately within its first element that the defendant wasn't a licensed firearm exporter or importer, but the second element requires that the defendant transferred, sold, traded, gave, transported, or delivered a firearm to another person. And as we see within the charging document here in this indictment, the government alleged that that transfer was to the Haitian Army. Based upon the record that was developed at the trial, there was no evidence to indicate that that transfer had been completed, including through the statements and testimony of my client, Mr. Duroseau, as well as the evidence that was shown during the course of the trial. There was no intent to make that delivery to the Haitian Army, yet that is how the government ultimately charged the defendant. Mr. Gray, you just used a word that's slightly different from transfer. You used delivery, and the statute does account for various methods by which it may be violated, including delivery, and I guess my concern is how do we differentiate between these various methods of violating the statute? If a transfer is something short of a delivery, then when is it complete, or is it your view that a transfer actually has to be completed via delivery of a firearm to a different person, in which case it would seem to subsume the other definitions in the statute? Well, Your Honor, I think the best way of looking at it, to use a phrase that we're seeing more and more on a common day, is the idea of a supply chain. What Congress's intent was, with regard to this statute, was to try to find a way of punishing each and every actor that could be involved along the pathway of a delivery or transfer to another person. I think it's important to understand that the to another person is an important portion of the statute. It's not only in there to identify that there has to be either the sale to, delivery to, transport to, or gift to, but ultimately, when we take a look at Elements 3 and 4 of the statute, they ultimately discuss the role of the transfer, the person who is being delivered to, or being transported to, or the firearm is being transferred to. When we look at the issue of the transfer, it identifies that that person must not be a person who ultimately was not licensed to be an importer, manufacturer, a dealer, or a collector, and that transfer cannot reasonably believe that the transferee, the person who received the firearm, did not reside within the defendant's state of residence. So did counsel put aside the charging document for a second, just on the statute? Did somebody receive, some person receive the firearms? Your Honor, no. So where are they? I mean, they went to somebody. They were intercepted by the authorities. Does that constitute, putting again, aside the constructive amendment charging document issue, if it was, if they were received by the Haitian government, perhaps not the Haitian army, aside from your indictment argument, would that satisfy the statute? In this case, no, Your Honor. And when we take a look at what took place in this case, when Mr. DeRosa arrived at the airport, he was originally turned away. When Mr. DeRosa had to draw attention to the fact that there were firearms that were there. But there was no completion of the delivery, and quite frankly, it was more of a surrender to law enforcement authorities at that point in time. So it's not the intended transfer, sale, delivery, gift, or device that's charged, Your Honor. And I think ultimately where Your Honor's question is going to is whether or not we have the completion of an offense when those firearms don't go from Mr. DeRosa to an intended person or entity. And Your Honor, it seems as though that the Congress, the congressional intent was clear. They did not include attempt in this statute, for whatever reason, they didn't include attempt. But they did contemplate that there was the delivery of, or transfer of, or the transfer to another person or entity. And in this case, that just didn't happen. Well, what's the difference between delivery and transfer? Aren't you, isn't your view just reading transfer out of the statute? No, Your Honor, because ultimately a transfer to what has meaning within the statute. In this case, we don't have that transfer. So what would have been sufficient, in your view, to violate on these facts? How much further or farther would your client have had to go to have completed a transfer? If Mr. DeRosa had come into the country, seen a member of the Haitian Army, delivered it to them, then we would have had the completion of the statute. That's a delivery. It's not a transfer. Or if Mr. DeRosa had come into the country, had transferred them to an agent that he knew was going to make the delivery, we would have a completion of the statute. Your Honor, ultimately, what Congress is trying to address is the movement and transfer of these firearms within their borders. That was clear within the Gun Control Act as to the statutory desires of Congress. Congress wasn't reaching out to say that we should, in fact, restrict the movement of these firearms to other countries. In fact, Congress came up with other statutes that address that very issue. And Mr. DeRosa was, in fact, convicted of those very same statutes. Counts 1 through 4 are all involving the export, movement, trade, sale, gifting of firearms outside of the United States. And ultimately, if the court's concern is that there's no repercussion for any sort of criminal conduct engaged in by Mr. DeRosa, that is satisfied by the convictions within Counts 1 through 4. But ultimately, Your Honor, when we take a look at what we have with Count 5, that was not a completed element. There wasn't a completed element. Therefore, a conviction based upon that conviction is inappropriate and can be, we would argue, a miscarriage of justice. When we look at the bigger picture, Your Honor, congressional intent and the plain reading of the statute doesn't make it that complicated. When we're looking at the intent and goal and purpose of the statute, it was there to make sure that those who were giving guns away to folks who shouldn't have guns, they're punished. But in this case, we didn't have the completion of that. And that's why we cited within our brief the James case, which shows that when you start to make that transfer and that transaction isn't completed, ultimately, there's no conviction and there's no crime there. So, Your Honor, we would argue that in this case, the elements have not been satisfied. There has not been sufficient evidence to indicate that. And ultimately, the court should vacate that finding of guilty as to that Count 5. So, Counsel, let's assume we agree with you hypothetically. Help me with what would happen. I mean, you're suggesting we should vacate Count 5. How does that change things the way the sentence was? He was sentenced, as I understand, 60 months under Counts 1 and 5 and 63 months under is either 2 or 3 or 3 and 4. And you still have one. So, I mean, even if we agree with you, what's the kind of practical effect of vacating 5? Your Honor, I think one of the most practical effects is we have a finding of guilt that a person has to carry with them that the government hasn't met its burden. We clearly have a miscarriage of justice, and the courts do not stand for that sort of thing. But if we want to look in terms of just practicality, every count of conviction carries with it $100 special assessment. $100 in lieu of the number of months he's going to spend in custody, there's some debate as to what feels worse. But ultimately, there's still a loss by Mr. DeRosa, whether it's the special assessment, whether it's the earning of a conviction. And part and parcel of why Mr. DeRosa went to trial is because of the nature of the convictions he would have to carry. I was his counsel at trial. I was the person who helped advise him and walk him through all the stages of trial, including walking over the nature and the evidence and the elements that the government must prove beyond a reasonable doubt if he goes into court. Mr. DeRosa was a Marine who was proud of what he did, and he did not want to take a guilty as to things he didn't do. One of those things he didn't do was impersonating an officer, and the jury ultimately found that to be the case. He also did not want to be found guilty of trying to pass off goods and arms to an entity that he certainly did not want to pass those arms off to. That's why he won and fought very hard as to count five. And, Your Honor, ultimately, that finding of guilt is based upon an instruction that instructed the jury to consider an attempt after the district court noted that you cannot find someone guilty of an attempt under this statute. That was very clear, and this was something that the jury had a lot of concerns with. The jury asked the question not once but twice. Once, on the first day of jury deliberation, they asked the question about whether or not the court or whether or not the jury should consider whether or not his intent and whether or not there was an attempt involved, because the jury's question was pretty clear. It said provided that the government did not prove that there was a deliverer. I think that's very significant because that shows that even in the face of the instructions from the court, the jury had concerns about whether or not the government had met its burden beyond a reasonable doubt of presenting any evidence as to that issue. And then that, unfortunately, that confusion was compounded by the court when the court ultimately instructed the court to consider whether or not his intent to deliver was appropriate. And that, Your Honor, unfortunately, is just another way of asking and advising a jury about attempt. And that's very shocking because in this case, even the district court acknowledged that there is no attempt in this case. There's no attempt that can be proven under this statute. And that the court can identify within 522 of the joint appendix. So when we look at how we got to the conviction, even the way we get to that conviction where the jury clearly has concerns about the sufficiency of the evidence, ultimately moved the jury into a position where it was erroneously placed. And that, Your Honor, is ultimately why we're here. The plain language and plain reading of the statute is pretty clear. Even to the extent of what the intent was with regard to the question of what's a state. The statute identifies what a state is and it says those that are within the territory of the United States, including Puerto Rico and the District of Columbia. I think it's of note that the statute specifically excludes one international presence. It specifically excluded the Canal Zone. This court in Caliccio ultimately said that when it looked at the intent of the Gun Control Act and 922A5, the intent was to allow the states to manage the movement within their borders. And found that there was a need that that transfer take place between the states. Whether it's from North Carolina, the South Carolina, North Carolina, the Florida. And ultimately have that transfer take place there to a person who was not licensed or otherwise authorized to take it. Mr. Gray, do you know why the statute excluded the Canal Zone? Well, Your Honor, it appears that from the legislative history that the intent was to maintain at least within the United States and those areas that are pretty much contiguous to the United States. Puerto Rico being kind of close. But, Your Honor, when we take a look at some of the areas that are specifically excluded, at the time the statute was proposed, the Canal Zone was still within the territorial jurisdiction of the United States. It wasn't until the 70s that President Carter ultimately gave the Panama Canal back, the Atreida back to Panama. So there was the ability for Congress to say, we're including the Panama Canal Zone, we're including territories such as Guam, America, Samoa. But Congress, more importantly, did not take that step. I'm sorry, I guess I maybe read somewhere that you were the trial counsel. You just reminded me about that. So with respect to the arguments that were made in front of the jury, was it your position from the get-go that because the firearms never made their way to someone in the Haitian army, that that, as a matter of law, was an insufficient, that the evidence was insufficient to convict? Yes, Your Honor, I argued that in my closing. During the course of the questioning of Mr. DeRoso, we asked that question specifically. Was it his intent to make the transfer? He said it wasn't. Ultimately, Your Honor, our argument was based and our objection was based on the idea that there was insufficiency of the evidence at the conclusion of the government's case and also before the jury got the evidence so that they could make a determination. The government suggests, I think, that the fact that the weapons did make themselves to someone in a position of authority, in this case, the Haitian National Police, that that should be sufficient to have a consummated offense. I think I know what the obvious answer is, but do you have anything else you want to add? Well, Your Honor, I will say this, that prior to being over here at the Federal Public Defender's Office, I was in AUSA in that same office. And one of the things that this court has always imposed upon those who are prosecuting is that you have to choose your words wisely and you have to prove your case beyond a reasonable doubt. In this case, the United States chose to place the words Haitian Army in there. The United States could have picked Haitian police. The United States could have picked the version of transportation security that Asia has. They could have even chosen a different entity or a person or anything in particular. But that was the government's choice, Your Honor. And ultimately, it was the government's choice in terms of how they wanted to prove that burden. To change that choice, to change that decision ultimately is a constructive amendment. And we've made that argument within our reply brief, Your Honor, to a sufficient degree. So I won't labor in on that. But ultimately, Your Honor, when we look at how this case was proven, with regard to Count 5, there wasn't sufficient evidence for that, Your Honor. But if there is a desire to find a wrong, Counts 1, 2, 3, and 4 were that. Thank you, Your Honor. Thank you, Mr. Gray. I'm going to ask Judge Traxler if he has any questions of you before I let you sit down. No, thank you, Judge Diaz. Thank you, Your Honor. Mr. Gray, I will say this. Some lawyers who move over to the defense side after spending time with the government never quite make that transition all that smoothly, but you appear not to have had that problem. Thank you for your argument this afternoon. Mr. Schenker. Thank you, Your Honor. May it please the Court, Vijay Schenker for the United States. Your Honors, with all due respect to my colleague and friend, I found it telling that he focused entirely during his argument on the words transfer and deliver in the statute. He read the word transport right out of the statute. And as the Eighth Circuit made clear in its James decision, there are multiple means of violating this statute. Now, what we charged here was a transport to the Haitian army, and we can probably reach that question of who actually received the firearms in a moment. But we charged a transport, and if we may, this is a sufficiency claim here. So let's look at what was proven and what the defendant did. He actually said that his intent was to take firearms to Haiti and train the Haitian military and national police. He actually did fly with weapons to Haiti from the United States, and he actually did have weapons end up in the hands of the Haitian national police. Judge Diaz, can I ask a question at this point? Absolutely. Mr. Schenker, at what point was the offense complete? When he drove out of his driveway with the weapons on his way to the airport, and then, of course, as you just related, all the different incidents, at what point was the crime complete in your view? In our view, Your Honor, and I understand this is a difficult question. There are multiple ways to approach this. Our position would be that the court could certainly rule, based on the statutory language and the nature of transportation as a continuum offense, that the offense was complete once any level of transportation to the intended recipient occurred. Before he drove out of his driveway, in your opinion, he would be guilty? I think a jury could certainly find that, Your Honor. I want to know what the law is. I know what juries might do, but what's your opinion as to what the law is, and when is the offense complete? I think the offense could be complete once the defendant takes any level of transportation, including out of his driveway, to the intended recipient. Now, I understand that that's a little bit of an aggressive reading of this statute, and I don't think it has to be reached here. What we have here is a defendant who actually ended up in Haiti, his intended destination, and the location of his intended recipients. At the very least, one could read the statute to say that once the defendant has reached a location where it is reasonably likely or one could reasonably expect that his or her intended recipients could come into possession of these weapons, that the offense is complete at that point. But I think our position at the very least is that transport does not require actual delivery or transfer of possession. What's the purpose of to another person in the statute based on your reading? You suggest transport is being read out by the defendant. I understand that argument. I think transport means something different than those other terms. And I agree it has some connotation about the movement of something from one place to another, and that's different than those other terms. So I get transport's different, but it seems to me your reading of it all but eliminates to another person. Well, I think there's two, and there's another person. Now, we clearly have the intent here to provide firearms to another person. The another person is the recipient who is not licensed. We're not talking about intending to. The statute says that you do it. You do one of those things. It's not what you have in your mind. Yes, Your Honor. Sorry if I misunderstood. No, no, no. So to, I think I'm just trying to separate the word to from another person. I'm not, we don't intend to read the word to out of the statute. To is a directional preposition. And so in our position, a defendant, for example, who has this intent, I understand intent's not all of it, but has this intent to, let's say, take firearms to Haiti, goes to buy the firearms at his or her local gun store and then brings them back to their house. Now, they have the requisite intent and they have engaged in a transportation, but they haven't engaged in a transportation to the intended recipient at that point. So that would not be a violation of the statute. So our position doesn't read the word to out of the statute. It just requires some level of a directional movement in the direction of the intended recipient. And we have that here. I mean, we have much more than that. We have actual arrival in the location. But to use Judge Traxler's hypothetical, I think if the movement out of the driveway is in any way part of the transportation to the location where the intended recipient is, then that satisfies the word to in the statute. Let me hypothetically assume you're right. How does that not constructively amend your indictment? Well, Your Honor, as I said, the defendant did arrive in Haiti with the firearms here. Now, the variance is what I think it is in proof at most would be that the firearms were taken to the Haitian National Police rather than the Haitian Army. Right. And we would submit that that is at most a nonfatal variance. There is still a violation of the statute. All of the elements of the statute are met. But what the government proved as a violation, it varied from what was charged in the indictment. Now, that's a nonfatal variance. Mr. Shanker, let me ask you a question. As I understand your argument, you're saying that the word to means toward. Exactly. Am I accurately summarizing your position? That's correct, Your Honor. Why didn't Congress just use the word toward? Well, Your Honor, if the words, in our view, are synonyms, then, you know, I can't speak to why Congress chose one or the other, but these are synonymous words. And if we accept that to means toward, then, in our view, it doesn't matter that Congress chose one over the other. Okay. I understand your position. Thank you. Thank you. Now, Your Honors, I would like to go back to the question of preservation here. Now, my colleague said that it was his position in the district court that there was insufficient evidence to show a transport to. But with all due respect, again, this was never raised in any of his Rule 29 motions before the district court. The only basis for the Rule 29 motion was that the statute required a domestic transport. But even if we agree with you on that point, isn't it that the fact is that the judge, the district court, engaged with the argument, didn't he? So why isn't that enough to preserve the issue? He engaged with it with respect to the jury instruction solely and not with respect to a sufficiency claim. Now, a traditional sufficiency analysis by the district court would involve applying the facts to the law and seeing what a reasonable jury could have found and what the reasonable inferences from the evidence would have been. And the district court didn't engage in any of that. Even to the extent that the district court addressed some of the law on this issue, that wouldn't relieve a waiver, the effect of a waiver. And effectively, when a defendant moves under Rule 29 on a specific ground, this court's cases say he or she has waived all of the grounds. There is some case law saying that when a district court passes on an issue, it might relieve or excuse a forfeiture, but it can't do so for a waiver. And so if the defendant did in fact waive this argument, then this court really should only consider it for a manifest miscarriage of justice. Which again, given the facts that we have here, which was, the fact remains that this defendant accomplished exactly what he set out to accomplish. He took firearms to a foreign country, to Haiti, and they did get into the hands of Haitian authorities. That's a very dangerous prospect. Haiti, as we all know, without casting any aspersions, is in a great deal of turmoil now. It is not considered a very safe place. These guns ended up in the hands of the Haitian National Police. There is quite a deal of overlap with the Haitian National Police and the Haitian military. And these guns could have gone anywhere, really. And those are the very ills that Congress set out to prevent in passing this statute. Can I go back to both of my colleagues' questions about the theoretical reach of the statute and the potential worst-case scenarios that might or might not apply? I find that all very troubling because we have to decide this case, obviously, with respect to the parties that are in front of us now. But we also have to be cognizant of what might lie down the road. And you seem to be saying that, at least with respect to this statute, that the court simply should trust the government as to how far the reach of the statute should apply. And Judge Traxler gave the example of someone leaving the driveway. But let's say in the scenario you posited that the defendant purchased the weapons with the intent at some point to transfer them to the Haitian army. He brings them home. He goes to bed. And in that morning, he decides, I'm going to the airport. Today's the day. So he gets out of bed and walks to the bathroom. Under your scenario, that would seem to be enough, wouldn't it? Well, I think in that particular hypothetical, it would not be enough. I don't think we would have shown. I don't think a reasonable jury could have known. He's taking a direction toward to the Haitian army. He's gotten up and getting ready to get dressed and about to leave the house. I mean, I don't know if he had the firearms on him at that point. Perhaps in your hypothetical, he does. He's carrying the bag from his bedroom to the bathroom. I understand these are very difficult lines. Well, it's precisely because it's a difficult question that the answer might be that we simply don't accept the view that any minimal level of transport is enough and that the words to a person mean something in this context. And that would be a reasonable reading of the statute, Your Honor. I was simply offering one potential reading of the statute. I think a perfectly reasonable reading of the statute and where this court could come out is the alternative that I proposed, which is that a transport to a location where it is reasonably likely and reasonably can be expected that the intended recipient could come into possession of the firearms. I mean, that's the evil that Congress was really trying to foreclose here. Now, what we are really arguing, though, is that transport cannot mean the same as actual transference or delivery because otherwise you're reading the word transport right out of the statute. But why can't – I mean, certainly I think you acknowledge that there can be overlap in words. And doesn't – I mean, can't transport be – it seems to me is the process of getting the firearms from where they start to where they're supposed to end. The other terms seem to be more like the actual handing over. And it seems to me they all could involve the firearms getting to – actually getting to the intended recipient. It's just covering the waterfront along the process from beginning to end. They do, Your Honor. But to read transport coextensively with transfer would render it a nullity.  Right. And so if we read transport in that way, we would be really immunizing from prosecution under the statute someone who, for example, on behalf of the actual owner of the firearms, carried the firearms all the way to the intended recipient, dropped them off in the woods there, left the scene, and then the recipient came and picked them up. Now, it was the owner of the firearms that actually transferred possession to the firearms because the mover did not have possession to transfer. But that's very much within the evils that this statute is meant to cover. That person who carried these firearms all the way to a place where the intended recipient could very well come into possession of them. But he or she did not actually transfer them. But to say that because they didn't actually turn over possession to the intended recipient, they're not covered under the statute, I think, is just not right. If the court has no further questions, we'll rest on our briefs. I have one more question. Sorry. If we were to accept the defendant's view of how this statute should be construed, then this crime would not be complete until the weapons were turned over to the person in Haiti, to the Haitian army in Haiti. So that means the crime then would be committed in Haiti. Now, where is the indication in this statute that Congress intended this particular statute to have extraterritorial effect? Well, I agree with you, Your Honor. And I think that's a reason not to give this statute that reading. I mean, I think that's part of the reason that once the transportation has begun, and transportation, again, is a continuing offense. And I realize this, again, is the most aggressive reading of the statute, one that we have suggested the court need not approach or adopt. Sorry. But if the transportation is a continuing offense and begins domestically, then that removes any extraterritorial implications from the statute. Now, even if the transfer, or I'm sorry, the handing over of the firearms is really the completion of the offense and it takes place in Haiti, I'm still not sure, though, that this would be an impermissible extraterritorial application of the statute. This is a U.S. citizen who began the crime in the United States. He or she failed to be licensed under U.S. law. He or she purchased the guns in the United States and then left the United States to transfer these firearms to someone who does not live in the or reside in the state that the defendant lives in. And I think that would be a domestic application of the statute. Okay. Thank you. Thank you, Mrs. Shanker. Thank you. Mr. Gray, you had some rebuttal? Yes, Your Honor, just briefly. To help answer the question that was posed by Senior Judge Traxler, I think it's important to recognize that the reading out the two within the statute will virtually nullify the third and fourth elements that are out there that deal with the transfer. And under the government's reading, that's what they're asking. Ultimately, under the government's reading, Mr. DeRosa would have committed this crime the minute he drove out of the parking lot of the gun store in Jacksonville, North Carolina, irrespective of who was receiving it, how far he goes, how far he went, or what his desires were. And that's trouble. The congressional intent on this is pretty clear in the plain language of the statute. The goal was to try to prevent the transfer of arms from one state to another to allow the states the opportunity to help regulate that sort of movement so that they had a role in ultimately maintaining the safety within their borders. With regard to the question of, well, how does Congress ultimately address the issue of the movement of firearms internationally? Your Honor, that's been done. That's what the Export Control Act does. It's specifically there to help address that area. And in this case, Mr. DeRosa was found guilty of that in counts one, two, three, and four. Ultimately, what we have here, Your Honor, is a charging decision that ultimately did not get met. The government wanted to try to prove that. They did not have the evidence to prove 922A5. And accordingly, Your Honor, it's appropriate for this court to vacate that conviction and remand back to the district court for appropriate proceedings. With respect to the government's statement as to our waiver, more specifically my waiver, during the trial, the district court knows nothing. The JA is replete with references that the district court exactly knew what it was trying to address. And ultimately, the district court and the purpose of waiver is to allow the district court the first opportunity to address these things. In this case, the district court did so. And when we take a look at the question of what was the district court addressing, did the district court address the issue as to sufficiency of the evidence? The JA on page 22 has Mr. Komanovich saying, Your Honor, may I just say, just for the record, in the light most favorable to the government, I submit that every element or substantial element to satisfy to get to this jury at this point. And then that's when the district court ultimately said, they're all going to the jury. I said, I'm taking it under advisement. All counts are going to the jury. But it's, I mean, and I anticipated Mr. Gray with renewing his motion. And he did so by nodding his head. Within that brief moment, we see the district court ultimately understanding my argument, ultimately rejecting my argument, and doing so after hearing the specific question as to the sufficiency of the evidence. And, Your Honor, ultimately, the problem that that created was the court understood that there was no attempt within the statute, ultimately allowed the jury to receive this issue. They had questions, and then the court ultimately advised us to the attempt. And that's what the jury came back to. So, Your Honor, based upon the plain reading of the statute, the government did not meet its burden. It did not provide evidence in order to meet its burden beyond a reasonable doubt. And we think it's appropriate and argued to this court that it should vacate the conviction as account five and remand to the district court for proceedings. Thank you. Thank you, Mr. Gray. I want to thank both counsel for their able arguments this afternoon. Although we would typically come down from the bench and greet counsel in the interest of safety, we're not going to do that this afternoon. But on behalf of the court, thank you very much for your arguments. Thank you, Your Honor.
judges: Albert Diaz, A. Marvin Quattlebaum Jr., William B. Traxler Jr.